CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 18 2011

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY | )<br>)<br>) Civil Action No. 5:10-cv-00087 |
| Plaintiff, | )<br>) |
| v. | ) **MEMORANDUM OPINION**<br>) |
| HERBERT H. HOSKINS, et al., | )<br>) By: Samuel G. Wilson |
| Defendants. | ) United States District Judge |

Plaintiff, St. Paul Fire and Marine Insurance Company ("St. Paul"), paid its insured, American Woodmark Corporation ("American") for losses American incurred in a fraud scheme allegedly perpetrated by one of American's former Hazard, Kentucky plant managers, Herbert H. Hoskins, with the assistance of his wife, Melanie Ann Hoskins, son, J.R. Wesley Hoskins, and two companies the Hoskins' controlled, Kentucky Lumber Sales, LLC ("KLC"), and Bluegrass Wood Products, LLC ("Bluegrass"), defendants (collectively "the Hoskins and their companies"). The Hoskins and their companies moved to dismiss St. Paul's complaint for lack of personal jurisdiction and improper venue. The court finds that St. Paul's pleadings allege with sufficient and particular detail that the Hoskins and their companies engaged in a conspiracy to defraud particularly directed at American's corporate headquarters in Winchester, Virginia. Therefore, St. Paul has satisfied its burden of making the prima facie showing necessary to support personal jurisdiction and that venue is proper in this court, and the court denies the Hoskins' and their companies' motions to dismiss.

**I.**

The facts, in the light most favorable to St. Paul, are as follows. American, a manufacturer and distributer of cabinets, is headquartered in Winchester, Virginia, and has

facilities in both Virginia and Kentucky. On June 10, 2002, American hired Herbert Hoskins as a plant lumber manager of its Hazard, Kentucky plant. As the plant lumber manager, Herbert "was responsible for pricing, purchasing and maintaining hardwood, lumber and wood components, and other materials for the lumber manufacturing process." On behalf of American, Herbert transacted business with two companies, KLC and Bluegrass, in which his son, J.R., and wife, Melanie, are principals.[1] The Hoskins formed KLC and Bluegrass for the sole purpose of defrauding American, and, accordingly, Herbert never disclosed to American his relationship to the two companies and their principals.

From October, 2005 to March, 2009, Herbert purchased lumber from KLC on behalf of American at inflated prices, resulting in overpayments of approximately $302,000. KLC mailed its invoices for payment to American's Winchester, Virginia headquarters, and American mailed its payments from its Winchester office to KLC in Heidrick, Kentucky. As part of the overall scheme, Herbert also convinced his manager, Stan Redmon, that American's lumber scrap was valueless and, therefore, that American should allow Bluegrass to take the "scrap" from its Hazard, Kentucky plant without payment. To that end, Melanie Hoskins, using the name "Ann Burnett" to conceal her identity, entered into four successive contracts between June 12, 2004 and January 1, 2008 with American which permitted Bluegrass to remove American's lumber scrap from its Hazard, Kentucky plant without payment. Bluegrass, in turn, sold the "scrap" to P.J. Murphy Forest Products Corp. ("P.J. Murphy") for $20 a ton, receiving an estimated $1,056,900.00 from 2004 to 2009.

---

[1] Affidavits submitted by the parties show that KLC and Bluegrass were both formed by J.R. Hoskins on the same day, both shared the same post office box and were both owned by J.R. and Melanie Hoskins. Melanie Hoskins was the manager of both companies and J.R. Hoskins did accounting work for them.

American required its managers, including Herbert, to send to American's manager of internal auditing, located at American's Winchester, Virginia headquarters, annual conflict reports disclosing potential conflicts of interest. These conflict reports are designed to inform American of its employees' business relationships that raise financial conflicts of interest. Herbert sent his conflict reports annually during his tenure as lumber manager to the corporate offices in Winchester, Virginia and never disclosed his connection to KLC and Bluegrass.

On March 25, 2009, American received an anonymous letter explaining that Melanie Ann Burnett was Herbert Hoskins's wife and an officer with KLC, and American terminated Herbert for purchasing lumber from KLC. A couple of weeks later, the President of P.J. Murphy contacted American about purchasing American's lumber scrap from Bluegrass. In reviewing its Bluegrass contract, American discovered that "Ann Burnett" was listed as the "manager" of Bluegrass. American stopped paying its account with KLC and stopped giving its lumber scrap to Bluegrass. On May 7, 2009, J.R. Hoskins sent a letter to Glenn Eanes, American's Vice President and Treasurer in Winchester, Virginia, demanding that American pay the balance owed to KLC, which, of course, American refused.

American filed a claim with its insurer, St. Paul, for its losses. St. Paul paid American $1,359,337.59, American executed a release and assignment to St. Paul, and St. Paul filed this suit. The Hoskins and their companies have moved to dismiss St. Paul's complaint on the grounds that this court lacks personal jurisdiction and that venue is improper.[2]

---

[2] Melanie Hoskins filed a *pro se* motion to dismiss on behalf of KLC and Bluegrass. Limited liability companies may not proceed *pro se*. See, e.g., Lattanzio v. COMTA, 481 F.3d 137, 140 (2d Cir. 2007); Vick v. Wong, 263 F.R.D. 325, 328 (E.D. Va. 2009). The court trusts that KLC and Bluegrass will have counsel represent them in any future proceedings.

## II.

The Hoskins' and their companies moved to dismiss for lack of personal jurisdiction on the ground that they lack sufficient contacts with Virginia to subject them to suit here. The court concludes, however, that St. Paul's complaint sufficiently shows that defendants participated in a tortuous conspiracy intentionally and purposefully directed at Virginia, sufficient to subject them to specific personal jurisdiction here. Accordingly, the court denies defendants' motions to dismiss.

To exercise personal jurisdiction over a nonresident defendant, the plaintiff bears the burden of making a prima facie showing that jurisdiction is authorized by the state's long arm statute and that the exercise of personal jurisdiction would be consistent with due process under the constitution. See Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004). "Virginia's long arm statute [VA Code § 8.01-328.1] extends personal jurisdiction to the limits allowed by due process." Id. Thus, "the statutory inquiry merges with the constitutional inquiry." Consulting Engineers Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009) (citing Young v. New Haven Advocate, 315 F.3d 256, 261 (4th Cir. 2002)).

The Due Process Clause requires that the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). There are two forms of personal jurisdiction: general[3] and specific. Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984). "[Where a] defendant's contacts with the forum state

---

[3] "General . . . jurisdiction . . . requires 'continuous and systematic' contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred." CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 292 n.15 (4th Cir. 2009) (citations omitted). St. Paul's pleadings fail to establish that the defendants had the level of contacts necessary for general jurisdiction.

4

provide the basis for the suit[,] . . . those contacts may establish specific [personal] jurisdiction." Mitrano, 377 F.3d at 407 (internal quotation marks and citations omitted).[4] But, a defendant's contacts "must be directed at the forum state in more than a random, fortuitous, or attenuated way." ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 625 (4th Cir. 1997) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). "When the defendant has intentionally directed his tortuous conduct toward the forum state, knowing that that conduct would cause harm to a forum resident . . .[,] a court may exercise specific personal jurisdiction over a nonresident defendant acting outside of the forum[.]" Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 397–98 (4th Cir. 2003) (citing Calder v. Jones, 465 U.S. 783, 789–90 (1984)).

When the plaintiff claims that a civil conspiracy supports personal jurisdiction, the court employs a slightly modified analysis. See Lolavar v. De Santibanes, 430 F.3d 221, 229 (4th Cir. 2005). Under a conspiracy theory of personal jurisdiction, "a conspirator not present in the forum state will, nevertheless, be adjudged to have had a personal presence in the forum State by means of adequate minimum contacts of the other conspirators[.]" Id.[5] As explained by one court,

> when individuals conspire to do something that they could reasonably expect to have consequences in a particular forum, if one coconspirator who is subject to personal jurisdiction in the forum commits overt acts in furtherance of the

---

[4] "The relevant question is not where the contacts predominate, but only whether enough minimum contacts exist that the [court's] assumption of specific jurisdiction [satisfies] due process." English & Smith v. Metzger, 901 F.2d 36, 39 (4th Cir. 1990).

[5] "The conspiracy theory of personal jurisdiction is based on the time honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy." Textor v. Board of Regents, 711 F.2d 1387, 1392 (7th Cir. 1983) (internal quotation marks and citations omitted). The conspiracy theory of personal jurisdiction, the use of which varies by court, appears to merge the questions of liability, jurisdictional, and agency law. See Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis*, 52 FORDHAM L. REV., 234, 235–37 (1983).

conspiracy, those acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction even if they have no other contacts with the forum.

Cline v. Hanby, 2006 U.S. Dist. LEXIS 90469, at *21–22 (D.S.W. Va. Dec. 13, 2006). In utilizing the conspiracy theory of personal jurisdiction, the plaintiff must "make a threshold showing . . . that a conspiracy existed and that the defendants participated therein." McLaugnlin v. McPhail, 707 F.2 800, 807 (4th Cir. 1983); see also Cline, 2006 U.S. Dist. LEXIS 90469, at *23 (requiring more than bare allegations of conspiracy).

Here, St. Paul has carried its burden of making more than a bare assertion of civil conspiracy purposefully directed to Virginia, especially given the difficulties of showing a hidden conspiracy before discovery. See, e.g., Mandelkorn v. Patrick, 359 F. Supp. 692, 696 (D.D.C. 1973) (noting the difficulty of showing a conspiracy in the initial pleading stages). St. Paul's pleadings show a civil conspiracy among defendants that specifically targeted American and that purposefully directed fraudulent conduct to American's home office in Virginia. According to those pleadings, the Hoskins formed KLC and Bluegrass for the sole purpose of defrauding American, using Herbert's inside position as a lumber manager at American to carry out their fraudulent scheme to sell American lumber at inflated prices and to appropriate valuable scrap. St. Paul's pleadings contain indicia of a scheme to defraud. They show that the Hoskins' purposely concealed Herbert's financial relationship with the Hoskins' companies both in the conflict reports Herbert sent to American's headquarters in Virginia and in Melanie Hoskins' signing her name as Ann Burnett in contracts with American in order to conceal her identity, and they show that Bluegrass received more than $1 million for scrap Herbert claimed to be valueless.

The pleadings also show the alleged conspiracy's connection to Virginia to be essential to its success. Herbert sent his conflicts of interest reports to American's home office is in Winchester, Virginia, and for four years, KLC sent its invoices to and received its payments from that office. Even after American discovered the alleged conspiracy, J.R. Hoskins sent a letter to American's Virginia headquarters demanding payment for the last lumber load KLC delivered to American. See, e.g., Grand Entm't Grp. v. Star Media Sales, 988 F.2d 476, 482 (3d Cir. 1993) (internal citations omitted) ("[C]ommunications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction.")

As St. Paul has adequately shown a prima facie case of a civil conspiracy among the defendants and shown that substantial acts in furtherance of that conspiracy occurred in Virginia, this court has personal jurisdiction over the parties. Accordingly, the court denies defendants' motions to dismiss for lack of personal jurisdiction.[6]

### III.

Defendants also have moved to dismiss on the ground that venue is not proper in this district under 28 U.S.C. § 1391. However, the court finds that the same facts that establish the court's specific personal jurisdiction over the alleged conspirators also show that "a substantial part of the events or omissions giving rise to the claim occurred" in this district. See 28 U.S.C. § 1391(a)(2). Accordingly, the court denies defendants' motions to dismiss for improper venue.

---

[6] Though the court has found that St. Paul has made a showing of a civil conspiracy purposely directed to Virginia, sufficient to subject defendants to suit here, its findings are in the light most favorable to St. Paul. Whether defendants in fact engaged in tortuous conduct is necessarily an issue for trial.

## IV.

For the reasons stated above, the court denies defendants motions to dismiss for lack of personal jurisdiction and improper venue.

**ENTER**: May 18, 2011.

_____
UNITED STATES DISTRICT JUDGE