CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

MAR 07 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

ST. PAUL FIRE AND MARINE            )
INSURANCE COMPANY,                  )
                                    )
            Plaintiff,              )       Civil Action No. 5:10cv087
v.                                  )
                                    )
HERBERT H. HOSKINS, et al.,         )       By: Michael F. Urbanski
                                    )           United States District Judge
            Defendants.             )

## MEMORANDUM OPINION

This matter is before the court on plaintiff St. Paul Fire and Marine Insurance Company's

("St. Paul") Motion for Summary Judgment and Supporting Memorandum (Dkt. #s 89 and 90)

and pro se defendant J.R. Wesley Hoskins' Objection to Summary Judgment and Supporting

Memorandum (Dkt. #s 94 and 95). The other four pro se defendants in this matter, Herbert H.

Hoskins, Melanie Ann Hoskins, Kentucky Lumber Sales, LLC ("Kentucky Lumber"), and

Bluegrass Wood Products, LLC ("Bluegrass"), did not file memoranda in opposition to St. Paul's

motion for summary judgment. The matter has been fully briefed, and the court heard oral

argument on January 10, 2012.

Since the hearing, the parties have notified the court that Herbert Hoskins and Melanie

Ann Hoskins have filed Chapter 7 bankruptcy proceedings in the United States Bankruptcy

Court for the Eastern District of Kentucky. Because of the effect of the automatic stay

associated with these bankruptcy proceedings, see 11 U.S.C. § 362(a), this court ordered on

January 30, 2012, that the above-captioned matter be stayed as it relates to Herbert Hoskins and

Melanie Ann Hoskins. (Dkt. # 116.) St. Paul also filed motions for default judgment, (Dkt. #s

101 and 103), pursuant to Federal Rule of Civil Procedure 55(b) against Kentucky Lumber and

Bluegrass.  The court granted those motions and entered default judgments against the two

Kentucky limited liability corporations ("LLCs").  (Dkt. #s 116-118.)  Accordingly, St. Paul's

pending motion for summary judgment only applies to J.R. Wesley Hoskins.  The court finds

that genuine issues of material fact exist concerning J.R. Wesley Hoskins' knowledge and intent

that preclude summary judgment.  Therefore, the motion for summary judgment must be denied.

## I.

St. Paul is the fidelity insurance carrier of American Woodmark Corporation ("American

Woodmark"), a Winchester, Virginia based cabinet manufacturer.  St. Paul has sued defendant

Herbert Hoskins, his wife, Melanie Ann Hoskins, his son, J.R. Wesley Hoskins, and two

Kentucky LLCs organized by his wife and son, Kentucky Lumber and Bluegrass, for damages

resulting from an alleged scheme to defraud American Woodmark.  In count one, St. Paul claims

Herbert Hoskins breached a fiduciary duty owed his former employer, American Woodmark.  In

count two, St. Paul alleges that the four other defendants aided and abetted Herbert Hoskins'

breach of his fiduciary duty.  In counts three and four, St. Paul asserts common law and statutory

business conspiracy claims.  In sum, St. Paul asserts that defendants defrauded American

Woodmark by (1) selling it lumber at inflated prices and (2) taking its wood scrap at little or no

cost and reselling it for a substantial profit.

Herbert Hoskins was employed by American Woodmark as lumber manager from June

10, 2002, through April 8, 2009, at its plant in Hazard, Kentucky.  St. Paul alleges that, as lumber

manager, Herbert Hoskins was responsible for purchasing and maintaining hardwood and selling

wood scrap associated with its cabinet manufacturing process.

On August 8, 2005, Herbert Hoskins' wife, Melanie Ann Hoskins, and their son, J.R.

Wesley Hoskins, organized Kentucky Lumber and Bluegrass.  In doing so, Melanie Ann Hoskins

2

used her maiden name, "Melanie Ann Burnett," and J.R. Wesley Hoskins used the name "James Robert Wesley Hoskins." St. Paul alleges that shortly after the articles of organization for Kentucky Lumber were filed, Herbert Hoskins arranged for American Woodmark to begin purchasing lumber from Kentucky Lumber. American Woodmark published corporate purchasing guidelines each month that set upper price limits for lumber purchases. According to the allegations in the complaint, Herbert Hoskins consistently purchased lumber from Kentucky Lumber that exceeded the limits established by the guidelines. St. Paul alleges that each purchase from Kentucky Lumber was negotiated by Herbert Hoskins on behalf of American Woodmark and by Melanie Ann Hoskins or J.R. Wesley Hoskins on behalf of Kentucky Lumber. To evidence their involvement in the lumber purchases, St. Paul references American Woodmark purchase orders with Kentucky Lumber, indicating on their face that they were confirmed by "James" or "Ann," as exhibits to the motion for summary judgment.[1]

St. Paul also alleges that, in furtherance of the scheme to defraud American Woodmark, Herbert Hoskins negotiated a contract between P.J. Murphy Forest Products Corporation ("P.J. Murphy") and Bluegrass for the purchase of wood scrap. According to St. Paul's allegations, Herbert Hoskins persuaded his supervisors at American Woodmark, specifically Stan Redmon, to allow Bluegrass to obtain supposedly worthless wood scrap from American Woodmark for little or nothing.[2] Bluegrass would then resell the wood scrap for a substantial profit to P.J.

---

[1] St. Paul claims that Melanie Ann Hoskins used her maiden name, Burnett, on the Kentucky LLCs' organizational documents and her middle name, Ann, on the purchase orders in an effort to conceal her identity from American Woodmark. St. Paul further claims that the use of the name "James" on the purchase orders was done to disguise the involvement of defendant J.R. Wesley Hoskins.

[2] Bluegrass first purchased the wood scrap from American Woodmark for $10 per ton, and the price was later reduced to $5 per ton. Eventually, Bluegrass obtained the wood scrap at no cost. Bluegrass resold the wood scrap to P.J. Murphy for $20 per ton.

3

Murphy. St. Paul also alleges that Herbert Hoskins led Redmon to believe that Fred Faehner, president of P.J. Murphy, was actually the owner of Bluegrass.

American Woodmark requires its employees to report potential conflicts of interest. While Herbert Hoskins had reported a conflict of interest in the past,[3] he did not disclose any potential conflict of interest regarding the transactions with Kentucky Lumber or Bluegrass. On March 25, 2009, American Woodmark received an anonymous whistleblower notification identifying "Melanie Ann Burnett" as Herbert Hoskins' wife, Melanie Ann Hoskins. It also identified her as an officer of Kentucky Lumber. Upon receiving the whistleblower notification, American Woodmark performed an analysis of all lumber vendors serving the Hazard facility and discovered that American Woodmark was paying substantially more for lumber purchased from Kentucky Lumber than from any other vendor. St. Paul alleges that Herbert Hoskins' actions caused American Woodmark to overpay Kentucky Lumber $243,381.05 over the course of three and one half years.[4] During American Woodmark's investigation, Herbert Hoskins was questioned by the company's human resources director and admitted to purchasing lumber from his wife and son's company without notifying American Woodmark of the potential conflict of interest. On April 8, 2009, American Woodmark terminated Herbert Hoskins' employment.

The next day, April 9, 2009, P.J. Murphy's Faehner called American Woodmark's Redmon to ask if P.J. Murphy could continue to buy wood scrap from American Woodmark through Bluegrass. Prior to this phone call, Redmon had no knowledge of the arrangement between Bluegrass and P.J. Murphy. Upon further investigation, American Woodmark calculated that over the course of five years P.J. Murphy paid Bluegrass a total of $1,130,280 for

---

[3] In early 2005, Herbert Hoskins notified American Woodmark of a potential conflict of interest after his son Billy Hoskins began working for Pine Mountain Lumber Company, one of American Woodmark's vendors.

[4] The Kentucky Lumber invoices were sent to American Woodmark's Winchester, Virginia, corporate offices, from which the payments were made. See Complaint, ¶ 15 (Dkt. # 1).

4

wood scrap acquired from American Woodmark. Bluegrass' payments to American Woodmark for the same wood scrap totaled only $73,380. Thus, Bluegrass netted $1,056,900 from the sale of American Woodmark's wood scrap.

After identifying the loss from both the overpayment of the lumber and the sale of wood scrap, American Woodmark made a claim to St. Paul on its fidelity insurance policies. St. Paul paid American Woodmark $1,259,300 on the claim and was assigned American Woodmark's rights against defendants. It was later determined that the overpayments to Kentucky Lumber were calculated incorrectly, and American Woodmark reimbursed St. Paul $59,056.54, yielding a total claim figure of $1,200,243.46.

## II.

In its motion for summary judgment, St. Paul argues that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law on all four of its claims. In count one, St. Paul asserts that Herbert Hoskins breached his fiduciary duty to American Woodmark by: (1) failing to disclose that his wife and son owned Kentucky Lumber and Bluegrass; (2) causing American Woodmark to overpay for lumber bought from Kentucky Lumber; and (3) misrepresenting the value of American Woodmark's wood scrap and permitting Bluegrass to acquire it for little or nothing.

In count two, St. Paul alleges that Melanie Ann Hoskins, J.R. Wesley Hoskins, Kentucky Lumber, and Bluegrass aided and abetted Herbert Hoskins' breach of his fiduciary duty because: (1) they had actual knowledge of the existence of Herbert Hoskins' fiduciary duty through knowledge of his position within American Woodmark; (2) they had actual knowledge of Herbert Hoskins' various actions in breach of that duty; and (3) they participated in Herbert

Hoskins' breach of his fiduciary duty by selling lumber at inflated prices and converting the wood scrap.

In count three, St. Paul claims that all five defendants are liable for civil conspiracy to commit fraud and conversion as they acted in concert to intentionally conceal and misrepresent material facts relating to American Woodmark's transactions with Kentucky Lumber and Bluegrass in order to mislead and defraud American Woodmark.

Finally, in count four, St. Paul alleges that all five defendants are liable under Virginia's business conspiracy statute because they acted in concert for the purpose of willfully and maliciously injuring American Woodmark's business. As a result of this violation, St. Paul argues that it is entitled to treble damages, attorney's fees, and costs pursuant to Virginia's statute prohibiting malicious injury to businesses.

As noted above, St. Paul's motion for summary judgment is currently pending only against J.R. Wesley Hoskins, who filed a memorandum in opposition to the motion. J.R. Wesley Hoskins argues that St. Paul has not presented evidence sufficient to establish that he had knowledge of Herbert Hoskins' breach of his fiduciary duty, aided and abetted Herbert Hoskins in this breach, or engaged in a conspiracy to defraud or maliciously injure American Woodmark.

### III.

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties.

6

Celotex, 477 U.S. at 322.  Whether a fact is material depends on the relevant substantive law,

and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or

unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of

material fact.  Celotex, 477 U.S. at 323; Nguyen, 44 F.3d at 237.  If that burden has been met, the

non-moving party must then come forward and establish the specific material facts in dispute to

survive summary judgment.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586-87 (1986).  "All reasonable inferences drawn from the evidence must be viewed in the light

most favorable to the party opposing the motion," but "[a] mere scintilla of evidence supporting

a case is insufficient."  Nguyen, 44 F.3d at 237.

### A.

Neither party addressed the conflicts of law issue in this case, each assuming that

Virginia law applied.  The conflicts of law issue deserves more than passing scrutiny, however,

as all of defendants' conduct appears to have taken place in the proximity of American

Woodmark's plant in eastern Kentucky, all of the Hoskins live in Kentucky, and the two LLCs

were organized in Kentucky.  American Woodmark paid the Kentucky Lumber invoices from its

corporate offices in Winchester, Virginia, and presumably the scant Bluegrass payments were

credited there as well.  In this diversity case, the court must apply state substantive law.  Erie R.

Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Under the rule in Klaxon Co. v. Stentor Electric

Manufacturing Co., 313 U.S. 487, 496 (1941), a federal court sitting in Virginia and exercising

diversity jurisdiction applies Virginia's choice of law rules.  In a tort action such as this, Virginia

applies the lex loci delicti rule, which requires application of the law of the place where the

7

wrong took place. Jones v. R.S. Jones and Associates, Inc., 246 Va. 3, 5, 431 S.E.2d 33, 34

(1993). The place of the wrong for purposes of the lex loci delicti rule is defined as the place

where the last event necessary to make an actor liable for an alleged tort takes place, even if the

actor has no control over the location of that last event. Quillen v. Int'l Playtex, Inc., 789 F.2d

1041, 1044 (4th Cir. 1986). In this case, the last act necessary for each of the claims asserted is

the reasonable reliance by American Woodwork on the allegedly fraudulent invoices and

payments, which took place in Virginia when it paid the lumber invoices and processed the wood

scrap payments in its corporate offices in Winchester. As the loss was sustained in Virginia, the

court will apply Virginia law to the state claims of breach of fiduciary duty, aiding and abetting

breach of fiduciary duty, common law conspiracy, and violation of the state business conspiracy

statute. See Jordan v. Shaw Indus., Inc., No. 96-2189, 1997 WL 734029, *3 (4th Cir. Nov. 26,

1997) (quoting Restatement (First) Conflicts of Laws § 377, n. 4 (1934), for the proposition that

"'[w]hen a person sustains loss by fraud, the place of the wrong is where the loss is sustained,

not where the fraudulent representations are made,'" and holding that "the district court did not

err in choosing, as the law governing the fraud claims, the law of the State in which each plaintiff

respectively was headquartered and received defendant's . . . [misrepresentations]"); AvalonBay

Communities, Inc. v. Willden, No. 1:08-cv-777, 2009 WL 2431571, *6 n.5 (E.D. Va. Aug. 7,

2009), aff'd, 392 F. App'x 209 (4th Cir. 2010) (applying Virginia law to claims of fraud,

business conspiracy, tortious interference, and aiding and abetting a breach of fiduciary duty

where plaintiff "reasonably relied on the fraudulent invoices in Virginia and cut checks . . . in

Virginia"); Cars Unlimited II, Inc. v. Nat'l Motor Co., Inc., 472 F. Supp. 2d 740, 750 (E.D. Va.

2007) (holding, in a fraud and conspiracy case, that "the law of the forum where the party

allegedly defrauded is headquartered governs tort claims as such locale is both the place where

8

such party relied on the false representations and where its loss was sustained"); Insteel Indus., Inc. v. Costanza Contracting Co., 276 F. Supp. 2d 479, 486-87 (E.D. Va. 2003) (applying North Carolina law to an overbilling fraud claim arising out of a construction project in Fredericksburg, Virginia, because the false invoices were relied upon and paid out of plaintiff's corporate headquarters in North Carolina).

**B.**

In order to succeed on a claim for breach of fiduciary duty under Virginia law, St. Paul must establish the existence of a duty, a breach of that duty, and damages proximately caused by the breach of the duty. See Carstensen v. Chrisland Corp., 247 Va. 433, 443-44, 442 S.E.2d 660, 666 (1994). An agency relationship, as in the employer–employee relationship, creates a fiduciary duty on the part of the agent, or employee, to the principal, or employer. Banks v. Mario Indus. of Va., Inc., 274 Va. 438, 452-53, 650 S.E.2d 687, 695 (2007). "[A]n employee, including an employee-at-will, owes a fiduciary duty of loyalty to his employer during his employment," Williams v. Dominion Tech. Partners, L.L.C., 265 Va. 280, 289, 576 S.E.2d 752, 757 (2003), and this "fiduciary duty . . . prohibits the employee from acting in a manner adverse to his employer's interest." Hilb, Rogal and Hamilton Co. of Richmond v. DePew, 247 Va. 240, 246, 440 S.E.2d 918, 921 (1994). However, "[w]hether [an employee's] specific conduct taken prior to resignation [or termination] breaches a fiduciary duty requires a case by case analysis." Feddeman & Co., C.P.A., P.C. v. Langan Associates, P.C., 260 Va. 35, 42, 530 S.E.2d 668, 672 (2000).

"Virginia law allows a third party to be liable for another party's breach of fiduciary duty when that third party knowingly participated in the breach." AvalonBay, 2009 WL 2431571 at *11. Thus, under Virginia law, St. Paul may recover on its claim for aiding and abetting a breach

9

of fiduciary duty under count two if it can show that J.R. Wesley Hoskins: (1) had actual knowledge of the existence of the fiduciary duty, (2) had actual knowledge of the breach of that duty, and (3) participated in the breach of the fiduciary duty. Halifax Corp. v. Wachovia Bank, 268 Va. 641, 660-62, 604 S.E.2d 403, 412-13 (2004). The word "participate" in this context implies purposeful conduct, which means that the defendant "actually knows a breach of fiduciary duty is occurring and participates with mens rea in the consummation of the breach . . . [in order to be] held liable for aiding and abetting the breach." Id., 268 Va. at 664, 604 S.E.2d at 414. Stated another way, J.R. Wesley Hoskins "must affirmatively aid the breach with the requisite mens rea, or culpable state of mind." AvalonBay, 2009 WL 2431571 at *11.

St. Paul argues that it meets this standard because J.R. Wesley Hoskins: (1) knew his father was the plant lumber manager and therefore had knowledge of his duties and responsibilities; (2) had actual knowledge of Herbert Hoskins' breach of his fiduciary duties in concealing the conflict of interest with Kentucky Lumber and Bluegrass, overpaying for lumber bought from Kentucky Lumber, and providing the wood scrap to Bluegrass for little or nothing; and (3) participated in Herbert Hoskins' breaches by using aliases in dealing with American Woodmark, selling lumber at inflated prices, and obtaining wood scrap.

As evidentiary support for J.R. Wesley Hoskins' involvement in the lumber sales, St. Paul first points to the handwritten name "James" on the "Confirmation With" line of the American Woodmark purchase orders with Kentucky Lumber. See Affidavit of Glenn Eanes, Ex. D (Dkt. #90-5). St. Paul contends that the "James" referenced on these documents is J.R. Wesley Hoskins and that this signature shows that he was concealing his identity as a Hoskins family member from American Woodmark and his participation in the overpayments for lumber purchased from Kentucky Lumber. In rather stark contrast to St. Paul's assertions, J.R. Wesley

10

Hoskins denies that the name "James" on these purchase orders refers to him, that he signed any purchase orders, or that he transacted any lumber or wood scrap business with American Woodmark.  See Affidavit of J.R. Wesley Hoskins, ¶¶ 14-15, 21-23 (Dkt. # 95).  As further support for its contention that J.R. Wesley Hoskins knew of and participated in Herbert Hoskins' overpayments to Kentucky Lumber, St. Paul also references Melanie Ann Hoskins' interrogatory responses.  Nothing in these interrogatory responses, however, suggests that J.R. Wesley Hoskins had any role in the lumber and wood scrap purchases.  Indeed, J.R. Wesley Hoskins is not mentioned in Melanie Ann Hoskins' interrogatory responses.  Rather, she states: "I own both Companies and I buy and sell lumber and sawdust."[5]  See Melanie Ann Hoskins' Answer to Plaintiff's Interrogatory 1 (Dkt. # 90-3).

As evidentiary support for its contention that J.R. Wesley Hoskins knew of and participated in the theft of American Woodmark's wood scrap, St. Paul points to the sales agreements between P.J. Murphy and Bluegrass, J.R. Wesley Hoskins' interrogatory answers and Melanie Ann Hoskins' responses to requests for admission.  On its face, neither the Wood By-Product Purchase/Sale Agreement between Bluegrass and P.J. Murphy nor its subsequent amendment makes any reference to J.R. Wesley Hoskins.  (See Dkt. # 90-11.)  Neither agreement is signed by him.  The purchase/sale agreement is signed by William H. Hoskins as owner and Ann Burnett as manager.  The amendment bears only the signature of William H. Hoskins.  The affidavit of Faehner, president of P.J. Murphy, to which the agreement and amendment are attached, likewise makes no reference to J.R. Wesley Hoskins.  (See Dkt. # 90-13.)  Nor do the interrogatory responses cited by St. Paul establish any role by J.R. Wesley

---

[5] St. Paul refers to the material obtained by Bluegrass from American Woodmark as "wood scrap," and the Hoskins refer to it as "sawdust" or "dust."

Hoskins in Bluegrass' acquisition of wood scrap from American Woodmark. J.R. Wesley

Hoskins' responses to these interrogatories read as follows:

> 6. Identify and describe any and all communications between you and P.J. Murphy Forest Product Corporation ("P.J. Murphy").
>
> RESPONSE: My answer remains the same. I don't remember. I never really handled the front end side of the business. That was my mom. I don't know how to sell and buy lumber or dust. That's not what I do. I don't remember who I talked to. But I think I called around the time of about April or May 2009.
>
> 8. Identify and describe in detail any and all communications between you and Herbert Hoskins related to the matters set forth in the Complaint.
>
> RESPONSE: My answer remains the same. I believe the conversation was sometime back in 2004 or 2005. I don't remember. And the conversation I believe took place at my former place of residence of 1285 Sam Parker Rd, Gray, KY 40734.

See J.R. Wesley Hoskins' Supplemental Answers to Interrogatories 6 and 8 (Dkt. # 90-2).

Likewise, the response to St. Paul's requests for admission served by Melanie Ann Hoskins

make no mention of any knowledge of or participation in the wood scrap purchases and sales by

J.R. Wesley Hoskins. The request for admission and response cited by St. Paul state the

following:

> 3. Admit that you accepted payment from P.J. Murphy Forest Products Corp. for wood scrap acquired from American Woodmark.
>
> Answer # 3. Yes, because I had contract with P J Murphy.

See Melanie Ann Hoskins' Response to Request for Admission 3 (Dkt. # 90-11). Two other

responses to requests for admission provided by Melanie Ann Hoskins, not cited by St. Paul,

bear on the issue of the claimed participation of J.R. Wesley Hoskins in the transactions with

12

American Woodmark and P.J. Murphy. Her responses to Requests for Admission 6 and 7 state as follows:

> 6. Admit that you worked with J.R. Wesley Hoskins in the preparation of invoices to American Woodmark for the sale of lumber.
>
> Answer # 6. Wesley did not prepare invoice to American Woodmark, I did.
>
> 7. Admit that you worked with J.R. Wesley Hoskins in the preparation of invoices to P.J. Murphy Forest Products Corp. for the sale of lumber.
>
> Answer # 7. Wesley did not prepare invoice to P J Murphy, I did.

See Melanie Ann Hoskins' Response to Requests for Admission 6 and 7 (Dkt. # 90-11). In short, the evidence cited by St. Paul does not support is assertion that there is no genuine issue of material fact as to J.R. Wesley Hoskins' knowledge of and participation in Herbert Hoskins' breach of fiduciary duty. Rather, the evidence adduced by St. Paul suggests that there are material issues of fact that remain disputed.

Indeed, J.R. Wesley Hoskins affirmatively denies nearly all of the facts alleged by St. Paul. While J.R. Wesley Hoskins concedes that he knew his father worked at American Woodmark as lumber buyer, he asserts that he did not know his father's specific duties or whether he had pricing responsibility over the transactions with Kentucky Lumber or Bluegrass. See Affidavit of J.R. Wesley Hoskins, ¶¶ 3-4 (Dkt. # 95-9). Moreover, he asserts that he did not have any knowledge as to whether his father had any role concerning the wood scrap. Id. at ¶ 5. By his sworn affidavit, J.R. Wesley Hoskins avers that his father told him that his boss was approving the transactions between American Woodmark, Kentucky Lumber, and Bluegrass. Id. at ¶ 6. He also asserts that he believed that his father disclosed to American Woodmark his mother's involvement with Kentucky Lumber and Bluegrass. Id. at ¶ 7. J.R. Wesley Hoskins

states that he did not conceal his involvement in the organization of the two Kentucky LLCs as their existence is a matter of public record in Kentucky. Id. at ¶ 9. J.R. Wesley Hoskins also avers that he was not privy to American Woodmark's pricing guidelines and thus was not aware that the prices charged by Kentucky Lumber fell outside of those guidelines. Id. at ¶¶ 10-11. As to the wood scrap, J.R. Wesley Hoskins asserts that Bluegrass did not defraud American Woodmark by taking the sawdust as he understood it was waste posing a potential environmental hazard. Id. at ¶ 12. Contrary to St. Paul's assertion that J.R. Wesley Hoskins signed purchase orders as "James" in an attempt to conceal the relationship between the Kentucky LLCs and the Hoskins family, J.R. Wesley Hoskins claims that he did not sign those purchase orders. Id. at ¶¶ 14-15, 21. In sum, J.R. Wesley Hoskins asserts that he did not participate in any breach of fiduciary duty as he never bought or sold any lumber or wood scrap and did not personally transact any business with American Woodmark on behalf of Kentucky Lumber or Bluegrass. Id. at ¶¶ 22-23.

In fact, questions abound as to just what J.R. Wesley Hoskins' role was with the two Kentucky LLCs as no depositions have been taken in this case. Thus, it is not known whether J.R. Wesley Hoskins was an active participant in the business of Kentucky Lumber or Bluegrass, as St. Paul alleges, or whether he functioned in the more limited bookkeeper and tax advisor role that J.R. Wesley Hoskins outlines in his supplemental interrogatory answers. There he described his role in the businesses as follows:

> 1. Describe in detail your role, duties, and responsibilities at Kentucky Lumber Sales, LLC ("Kentucky Lumber") and Bluegrass Wood Products, LLC ("Bluegrass").
>
> RESPONSE: Helped my mom with the bookkeeping and with tax returns. I recorded receipts and disbursements of funds looking at the bank statements and checks and who the checks were made payable to and then posting those transactions to accounts. I

14

> reconciled the bank statements each month. I then prepared the tax
> returns using the account totals. I did this for both Bluegrass and
> Kentucky Lumber.

See J.R. Wesley Hoskins' Supplemental Answer to Plaintiff's Interrogatory 1 (Dkt. # 90-2).

The only specific actions directly attributable to J.R. Wesley Hoskins are referenced in

paragraph 39 of the affidavit of Glenn Eanes. (Dkt. # 90-5.) In 2009, J.R. Wesley Hoskins

wrote three letters to American Woodmark's Eanes demanding payment for lumber sold by

Kentucky Lumber. In the first letter, dated May 7, 2009, J.R. Wesley Hoskins tells Eanes to take

an additional fifteen business days to "conduct a reasonable investigation as to any alleged

conflict of interest." See Affidavit of Glen Eanes, Ex. L (Dkt. # 90-7). J.R. Wesley Hoskins

expresses confidence that such an investigation would resolve favorably to Kentucky Lumber

such that payment would be forthcoming, noting that the money owed Kentucky Lumber

"amounts to approximately 70% of my company's working capital." Id. In a follow-up letter of

June 5, 2009, J.R. Wesley Hoskins requests information on the status of payment. On July 16,

2009, J.R. Wesley Hoskins penned a rather hostile response to Eanes' apparent demand for a

$300,000 offset for overcharges for lumber. In this letter, J.R. Wesley Hoskins asserts that

Kentucky Lumber provided "the highest quality of lumber at the lowest possible price. The price

was fair to both companies considering the higher quality of the lumber." Id. The letter accuses

American Woodmark of taking lumber without paying for it and promises that American

Woodmark will "suffer the legal consequences." Id. J.R. Wesley Hoskins comments on these

letters in his answer to Interrogatory 4, as follows:

> 4. Describe in detail your communications with American
> Woodmark related to the allegations in the Complaint, including
> the identities with whom you spoke, the content of the
> communications and the dates of these communications.

RESPONSE: I only talked to somebody once and I can't even remember where that person worked or who I talked to. It could've been somebody from Woodmark. It was about some tickets or something. I don't remember. I didn't even know what I was talking about. I was just trying to help my mom.

In addition, on behalf of Kentucky Lumber, I wrote American Woodmark the letters and I don't regret it. They took my mom's lumber and they didn't pay for it. There is no overpayment and I am proud to stand up for my mom and tell them they got to pay her company for the lumber.

See J.R. Wesley Hoskins' Answer to Plaintiff's Interrogatory 4 (Dkt. # 90-2). While these letters suggest that J.R. Wesley Hoskins had more involvement in Kentucky Lumber's business than reflected in his answer to Interrogatory 1, they are not sufficient to establish as a matter of law that J.R. Wesley Hoskins knew of and participated in his father's breach of fiduciary duty. In short, because of the paucity of evidence as to J.R. Wesley Hoskins' knowledge of and participation in the alleged breach of fiduciary duty, the court cannot grant St. Paul's motion for summary judgment.

St. Paul argues that J.R. Wesley Hoskins' affiliation with the Kentucky LLCs is sufficient to prove that he aided and abetted his father's breach of fiduciary duty, relying on the Tysons Toyota, Inc. v. Globe Life Insurance Co., Nos. 93-1359, 93-1443, 93-1444, 1994 WL 717598 (4th Cir. Dec. 29, 1994), and AvalonBay decisions. These cases do not carry the day for St. Paul. To be sure, the Fourth Circuit Court of Appeals in Tysons Toyota states that "constructive notice of a breach of fiduciary duty suffices to hold a third party liable for participation in the breach." 1994 WL 717598 at *3 (citing Patteson v. Horsley, 70 Va. (29 Gratt.) 263, 276 (1877), and W.L. Chase & Co., Inc. v. Norfolk Nat'l Bank of Commerce & Trusts, 151 Va. 1040, 145 S.E. 725, 726, 730 (1928)). But knowledge, constructive or otherwise, only gets St. Paul half way towards proving a claim of aiding and abetting breach of fiduciary duty. In addition to

16

knowledge of a breach of fiduciary duty, St. Paul must prove J.R. Wesley Hoskins' participation in the breach. The <u>Tysons Toyota</u> decision does not obviate this element of the claim. Not only does the Fourth Circuit recognize this element, it found that "Tysons has alleged sufficient participation by the defendants in Horvath's breach of fiduciary duty." <u>Id.</u> at *4. It is in this respect that St. Paul's evidence is most glaringly lacking. While there is no dispute that J.R. Wesley Hoskins was involved in the organization of the two Kentucky LLCs, there is scant evidence, much less undisputed evidence, that he participated in the breaches of fiduciary duty reflected in the lumber sales and wood scrap purchases. Nor does the Eastern District of Virginia's decision in <u>AvalonBay</u> warrant a grant of summary judgment for St. Paul in this case. In <u>AvalonBay</u>, defendant Art Willden was prosecuted criminally for his role in a fraudulent billing scheme and pled guilty to one count of conspiracy to commit mail fraud. 2009 WL 2431571 at *2-3. In a subsequent civil action for fraud, conspiracy, and aiding and abetting breach of fiduciary duty, Willden was judicially estopped from challenging the facts established in his criminal case, which were sufficient to establish his participation in the scheme to submit fraudulent invoices. <u>Id.</u> at *4-6. No similar evidence exists in this case tending to establish the absence of a genuine issue of material fact concerning J.R. Wesley Hoskins' participation in Herbert Hoskins' breach of fiduciary duty.

### C.

In Virginia, "[a] civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, resulting in damage to the plaintiff." <u>Glass v. Glass</u>, 228 Va. 39, 47, 321 S.E.2d 69, 74 (1984). In this case, St. Paul alleges in count three that J.R. Wesley Hoskins conspired with the other defendants to commit fraud and conversion. To establish a claim for fraud under Virginia law, a plaintiff must prove

the following elements: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Winn v. Aleda Constr. Co., Inc., 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). A plaintiff must prove these elements by clear and convincing evidence. Id. In Virginia, conversion "'is any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of their possession.'" Bader v. Cent. Fidelity Bank, 245 Va. 286, 289, 427 S.E.2d 184, 186 (1993) (quoting Buckeye Nat'l Bank v. Huff, 114 Va. 1, 75 S.E. 769, 772 (1912)). Thus, to establish a claim for conversion under Virginia law, a plaintiff must prove: (1) "the ownership or right to possession of the property at the time of the conversion" and (2) "the defendant's conversion by the wrongful exercise of dominion or control over the plaintiff's property, depriving plaintiff of possession." Fed. Ins. Co. v. Smith, 144 F. Supp. 2d 507, 518 (E.D. Va. 2001), aff'd, 63 F. App'x 630 (4th Cir. 2003). These elements must be established by a preponderance of the evidence. Id.

　　　　As was the case with the aiding and abetting breach of fiduciary duty claim, St. Paul's evidence of J.R. Wesley Hoskins' involvement in a conspiracy to commit fraud and conversion falls short of what is required for the court to enter summary judgment on the civil conspiracy claim. St. Paul first references the use of the name "James" on the American Woodmark purchase orders as evidence of J.R. Wesley Hoskins' involvement in a conspiracy "to conceal his familial relationship with Herbert Hoskins." St. Paul's Memorandum in Support of its Motion for Summary Judgment, at 27 (Dkt. # 90). As noted previously, J.R. Wesley Hoskins denies that he signed any American Woodmark purchase orders, creating an issue of fact. Next, St. Paul asserts that "Herbert Hoskins worked with his wife and son to sell the wood scrap it acquired from American Woodwork to P.J. Murphy Lumber Company ("P.J. Murphy") for a profit," id. at

29, referencing the Wood By-Product Purchase/Sale Agreement between P.J. Murphy and Bluegrass, Melanie Ann Hoskins' responses to requests for admission, and the checks sent by P.J. Murphy to Bluegrass as payment for the wood scrap. None of this evidence implicates J.R. Wesley Hoskins. He is not mentioned in the purchase/sale agreement or its amendment, Melanie Ann Hoskins' admissions do not suggest he had any role in the lumber or wood scrap transactions, and he did not endorse any of the P.J. Murphy checks. Nor does any of the evidence referenced on page 30 of St. Paul's Memorandum in Support of its Motion for Summary Judgment support the assertion made there that J.R. Wesley Hoskins "interacted extensively with P.J. Murphy for 5 years while Bluegrass was stealing the wood scrap from American Woodwork. . . ." Id. at 30. Rather, the referenced discovery responses establish Melanie Ann Hoskins' involvement with the wood scrap transactions and J.R. Wesley Hoskins' role in the business as helping his mother with bookkeeping and tax returns. The evidence adduced to date is simply insufficient as a matter of law to establish that J.R. Wesley Hoskins participated in a civil conspiracy to defraud American Woodwork or convert its property.

### D.

Likewise, St. Paul's evidence is insufficient to establish a violation of the Virginia business conspiracy statute at this stage. In addition to proving the existence of a conspiracy, a plaintiff in a claim brought under Virginia Code § 18.2-499 must prove by "clear and convincing evidence that the defendants acted with legal malice, that is, proof that the defendants acted intentionally, purposefully, and without lawful justification, and that such actions injured the plaintiff's business." Williams v. Dominion Tech. Partners, L.L.C., 265 Va. 280, 290, 576 S.E.2d 752, 757 (2003). The evidence adduced by St. Paul in support of its motion for summary

judgment, as addressed above in connection with its other claims, falls short of what is required for the court to enter summary judgment on the business conspiracy claim.

**IV.**

In sum, as to all three of St. Paul's claims against J.R. Wesley Hoskins, (1) aiding and abetting breach of fiduciary duty, (2) conspiring to commit fraud and conversion, and (3) violating Virginia's business conspiracy statute, the court concludes that genuine issues of material fact remain concerning J.R. Wesley Hoskins' knowledge, intent and participation that preclude summary judgment. St. Paul's claims against J.R. Wesley Hoskins require proof of his knowledge of Herbert Hoskins' fiduciary duty, his knowledge of Herbert Hoskins' breach of that fiduciary duty, his intentional participation in Herbert Hoskins' breach of his fiduciary duty, his intent to enter into a conspiracy to defraud American Woodmark and convert its wood scrap, and his intent to willfully and maliciously injure American Woodmark's business in concert with the other defendants. These are necessary elements to St. Paul's claims against J.R. Wesley Hoskins. While St. Paul has provided evidence of Herbert Hoskins' actions during his employment with American Woodmark, J.R. Wesley Hoskins' involvement in the organization of Kentucky Lumber and Bluegrass, and those entities' transactions with American Woodmark, it has not met its burden of proving the absence of a genuine issue of material fact regarding J.R. Wesley Hoskins' level of knowledge, intent and participation in the alleged breach of fiduciary duty and conspiracy. J.R. Wesley Hoskins has submitted affidavits and other documentation asserting his lack of the requisite knowledge, intent and participation required to find him liable to St. Paul. These disputed issues of fact are best resolved by the jury, which is better able to make determinations regarding J.R. Wesley Hoskins' credibility, his level of knowledge

20

concerning his father's employment, and his intentions behind his alleged actions on behalf of Kentucky Lumber and Bluegrass.

Accordingly, it is **ORDERED** that St. Paul's Motion for Summary Judgment (Dkt. # 89) is **DENIED** as to J.R. Wesley Hoskins; **DENIED AS MOOT** as to Kentucky Lumber and Bluegrass because of the court's entry of default judgments against these entities; and **STAYED** as to Herbert Hoskins and Melanie Ann Hoskins due to their pending bankruptcy proceedings. The Clerk is directed to send a copy of this Memorandum Opinion and accompanying Order to pro se defendants and counsel of record.

Entered:  March 7, 2012

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge